In re:
ANASTACIO ALANIS,
    Debtor.                                                No. 7-03-16513 SL

**MEMORANDUM OPINION IN SUPPORT OF
ORDER VOIDING JUDICIAL LIEN**

    Anastacio Alanis-Rincon ("Debtor") has moved to avoid the transcript of judgment lien of Shelley Nichols-Shaw ("Creditor")[1] as impairing his homestead exemption. Doc 29. For the reasons set forth below, the Court finds that the lien should be avoided in its entirety on Debtor's interest in the homestead property.[2]

**Background**

    In 1999 Antonio Alanis, one of Debtor's sons, caused an automobile accident which severely injured and permanently disabled Creditor. Following Antonio's criminal conviction, Creditor brought a civil action against Antonio and Debtor based on various causes of action. Debtor did not appear on the trial date and a judgment was entered against Debtor and his son in the amount of $427,846.29 (which figure included $110,923.12 in pre-

---

[1] Debtor was represented by counsel Trey Arvizu; Creditor represented herself. Creditor did a quite creditable job of representing herself, and the Court is confident that even if Creditor had been able to afford an attorney, the outcome would not have been more favorable to her.

[2] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B),(K)and (O); and these are findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P.

judgment interest) together with accruing interest at the rate of 8.75% per year. Exhibit 7. The transcript of judgment was filed in Dona Ana County on May 7, 2003. Exhibit 5.[3] On August 18, 2003, Debtor filed his chapter 7 petition. Ultimately, Debtor received his discharge and the case was closed on June 16, 2006. On September 30, 2009, employing another attorney, Debtor got the case reopened and then filed the lien avoidance action at issue. Following extended pretrial proceedings, the matter was tried to this Court in Las Cruces over the course of two separate days.

**Analysis**

Since at the time of the acquisition of the property in question Debtor was (and still is) married to his spouse, the property in question is presumed to be community property under New Mexico law. N.M.S.A. (1978) §40-3-12(A) ("Property acquired during marriage by either husband or wife, or both, is presumed to be community property.") (2006 Repl. Pamph.). The evidence also made abundantly clear, nor has Debtor disputed, that he has at least joint control over the property and that the property is liable for his debts.

---

[3] Debtor numbered the pages of her exhibits consecutively (page 1 through page 91)so that, for example, the New Mexico State Police report of the accident, comprising three pages, is numbered 1-3. The next document is a one-page letter from the Third Judicial District Court Clerk's office, and consequently is identified as Exhibit 4. The transcript of judgment is comprised of pages 5 and 6, and is identified as Exhibit 5. The Court has adopted this numbering convention for all of Creditor's exhibits. (Note: Exhibits 1 and 4 were not admitted into evidence.)

11 U.S.C. §541(a)(2) provides as follows:

> The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
> . . .
>     (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--
>     (A) under the sole, equal, or joint management and control of the debtor; or
>     (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

In consequence, even though Debtor listed only his "½ interest in Residence [homestead]" on Schedule A (doc 1, admitted into evidence as Debtor's exhibit A), the entire property became part of the bankruptcy estate upon the filing of Debtor's petition. And this was so even though in Schedule C, Debtor claimed as exempt only "½ interest in Residence". <u>See, for example</u>, <u>In re Victor</u>, 341 B.R. 775, 781 (Bankr. D.N.M. 2006) ("Thus the debtor may exempt her one-half interest in the community property, while the whole of the property is included in the bankruptcy estate."), citing <u>In re Page</u>, 171 B.R. 349, 352 (Bankr. W.D.Wis. 1994) ("The debtor, therefore, was able to exempt her one half interest in the check but no more. It is irrelevant that because there were no objections, the entire check was deemed exempt.").

The trial focused on what exactly constituted the homestead on the petition date and what was the value of the homestead.

Page 3 of 16

Case 03-16513-s7   Doc 78   Filed 11/10/11   Entered 11/10/11 14:09:01 Page 3 of 16

Precise evidence on the issue of value was difficult to come by because of the passage of time and Creditor's resources.[4] The Court's findings are based on the testimony of Debtor, Creditor and Creditor's mother, the schedules and some of the exhibits, including photographs of the property at various times.

The relevant portion of §522(f) reads as follows:

(1) Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is--
   (A) a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523(a)(5);....
...
(2)(A) For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of--
     (i) the lien;
     (ii) all other liens on the property; and
     (iii) the amount of the exemption that the debtor
        could claim if there were no liens on the
        property;
exceeds the value that the debtor's interest in the property would have in the absence of any liens.

It appears that on the petition date, the parcel had on it the home that Debtor had built and occupied together with his spouse and their children ("green house"), the home under construction by another of Debtor's sons ("blue house"), and a mobile home. The homestead parcel consists of Lots 2 and 4 of

---

[4] At a previous hearing, Creditor explained that she could not find anyone in Las Cruces to research the records and provide her an estimate of the 2003 value of the property six years after the petition date.

the Ogaz Addition, Salem, Dona Ana County, New Mexico. Exhibit 13. While none of the exhibits admitted into evidence (including the deed) state the size of the total parcel, it appears that it is perhaps 4/10 of an acre or so.[5]

Debtor testified that he had purchased the two lots about 1986 for $6,000.[6] He cleared them of weeds and "hills" and then spent two years constructing the green house. Debtor got help from his brother in laying the concrete foundation for the green house. He then constructed the walls of cinder block with a concrete coating, and the roof is concrete and rebar. He brought running water into the house, and had electricity and gas installed. The house however has no insulation, and no heating or air conditioning. The photographs suggest that Hayes Street was not paved. Exhibits 86 and 87.

Two months after completing the home, Debtor moved himself,

---

[5] This is based on exhibit 86, a December 29, 2009 "address certificate" from Dona Ana County based on a 2007 aerial photo (exhibit 87). Exhibit 86 has a measurement legend on the bottom showing 130-foot increments. The photo measurements would be roughly consistent with Debtor's testimony that the green house was about 800 square feet. Although not admitted for this purpose, exhibit 22 from the Dona Ana County assessor's office shows the square footage of the parcel as 19,600 square feet, which would be approximately .45 acre, and the square footage of the green house at 798.

[6] Debtor purchased the lots from his brother Donato Alanis and Donato's spouse Petra. Exhibit 13. The one-page standard form deed reflects that it was acknowledged by the transferors on July 3, 1990 and recorded on July 5, 1990. Debtor explained, with no evident irony, that it took a long time to get the paperwork together.

his spouse and his ten children into the home.  Debtor estimated that the house is about 800 square feet, and also testified that the house was comprised of a 15' by 15' bedroom, 15' by 15' living room, 14' by 14' kitchen and the bathroom.  Debtor testified in effect that there was not enough room in the house for all the children; some of them suffered through having to sleep in the uninsulated shell of the blue house as it was being constructed.

After building and moving his family into the green house, where he and his spouse have continuously resided ever since, he or one of his sons began to construct the blue house.  That house was partially constructed – from the photographs it appears that it had a floor, walls and roof but little else, including no windows or doors – as of the date of the filing of the petition. Exhibit 83.  There was also apparently a trailer or mobile home ("traila" or "casa movil") on the property being used by the son during the construction of the blue house.[7]  However, comparing exhibit 83 with exhibit 84 (taken on March 17, 2004), it appears that the mobile home was not there at the time the petition was filed.  In any event, there was insufficient evidence about whether the trailer was affixed to the real estate, and it did not belong to Debtor and was subsequently moved.

---

[7] Photographic exhibits 84 and 85 suggest the trailer may have been a small manufactured home.

Debtor's schedule A[8] listed Debtor's "½ interest in Residence" valued at $20,000, meaning the homestead had a total value of $40,000. Since Debtor's spouse has not filed, the "½ interest in Residence" accurately characterized Debtor's interest in the property. Other than the transcript of judgment, there were no liens on the property. Schedule C claimed exempt Debtor's $20,000 interest in the property. No objections were filed to the claimed exemptions, including the homestead exemption.

Debtor's trial testimony about the value of the property was consistent that entire property was worth about $20,000 in August 2003. But as noted that testimony was at odds with the information in Debtor's schedules, which implied that the property was worth $40,000.

Debtor's counsel argued that the listings in the schedules were ambiguous, so that the listings could mean the entire property constituting the homestead was valued at $20,000. That argument would be consistent with Debtor's repeated insistence at trial that the property at issue had a total value of $20,000. However, Schedule A not only lists the value as $20,000 under the Schedule A instructions of "Current Market Value of <u>Debtor's</u> Interest in Property" (emphasis added); it also states under

---

[8] The Court takes the schedules, signed by Debtor under oath, as admissions of Debtor.

"Nature of Debtor's Interest in Property" that Debtor is "Co-Owner". Schedule C also lists Debtor's "½ interest in Residence" as exempt. But Schedule C also lists $20,000 as the "Current Market Value of Property Without Deducting Exemptions" for Debtor's "½ interest in Residence". It is true that in this context "Property" is not clarified either in the heading of the column or in the entries made by Debtor. And Debtor is therefore correct in arguing that that specific entry is ambiguous taken alone, since that listing could be interpreted as simply stating that Debtor's interest was worth $20,000, or that the entire property was worth $20,000. But especially in light of the listing in Schedule A, the former interpretation seems more likely.

This interpretation of Debtor's schedules is bolstered by the fact that the maximum homestead exemption available to Debtor at that time was $30,000, having been raised from $20,000 by an amendment to the statute in 1993. N.M.S.A. (1978) §42-10-9 (2011 Cum. Supp.). Debtor's exemption of $20,000 fits neatly with an effort by Debtor to exempt the entire value of a one-half interest in the property if the value of the entire property were $40,000. The Court also takes judicial notice of the adjudicative fact that Debtor's previous counsel at that time was (and she still is) an experienced chapter 7 debtor's attorney who spoke fluent Spanish. Thus the Court finds that the Schedule A

listing is sufficiently unambiguous that the Court finds that Debtor valued his "½ interest in Residence" at $20,000.

The Court would have expected Debtor to have explained the discrepancy between his current valuation and the valuation clearly implied in his schedules, including if necessary calling as a witness Debtor's former counsel to help with the explanation.  There could of course have been many reasons Debtor did not call his former counsel as a witness, including that Debtor's resources were limited, that former counsel would not have a sufficient recollection of the facts to be at all useful, etc.  Had former counsel been called and testified that the schedules were erroneous and that she had meant to value the entire property at $20,000 instead of attributing that value only to Debtor's half interest, the Court might have agreed with Debtor's valuation.  However, the Court finds more persuasive Debtor's sworn statements in his schedules filed in 2003, and will use that value for this decision.

There was a considerable dispute about details about the house (and just about everything else), based in part on the Debtor's insistence that he cannot read or write, having had no formal education whatever.  Debtor also testified that the lack of schooling meant he was not good at arithmetic.  He stated that all his life he had worked in agriculture, suggesting that he had no need of reading, writing or arithmetic skills to make a

living.  Creditor vigorously challenged Debtor's inability to provide details about square footage, dollars spent, etc.  For example, she raised the question of how Debtor knew how many bags of cement to purchase for the concrete floor of the green house.  (Similar questions could be raised about estimating the number of cinder blocks needed for the walls, the amount of rebar for the roof, the size of the window and door openings, etc.)  Debtor responded that he simply estimated those things.  The Court finds that Debtor overall was credible on this issue.  While the Court believes that Debtor may have downplayed his abilities somewhat (particularly his calculation skills), the Court also finds that a building as described by Debtor could be built without the need for the skills implied by Creditor's questions.  It is worth noting that there is no evidence of a building permit for the green house, so that technical requirements that might have been imposed by the town or the county would not have hindered Debtor's efforts.  Nor was there enough evidence about the quality of the construction of the green house such that the Court could extrapolate from the construction what Debtor's computational skills were at the time.

Creditor argued vigorously that the facts that the parcel consists of two lots, has two or three different house numbers (859 [green house], 865 [former location of the house trailer] and 869 [blue house] Hayes Street), could be subdivided, and may

have separate utilities running to the green house and the blue house meant that Debtor was not entitled to treat the entire property as exempt, or that it exceeded the exempt value. The short answer is that the entire property was exempted by Debtor and no one objected.[9]

Creditor also sought to introduce into evidence various documents from the offices of Dona Ana County to show that someone at the county put a higher value on the property. Exhibits 10 (assessor's office CY 2003 valuation of the land and building at $45,400), 11 (same for CY 2004)[10], 12 (CY 2005 valuation at $50,546), 77 (county building permit issued March 3, 2004 in which someone has valued the blue house at $60,000), and 82 (January 21, 2004 red tag report that apparently led to issuance of exhibit 77). See also exhibits 54-59, 63 (mortgages to Coronado Finance, Inc. in varying amounts), 75 and 78 (letters from Shan Nichols, Creditor's mother, to trustee providing information about values of property, conduct of Debtor, etc.).

---

[9] And given the use of both lots as a single parcel, the fact that the area is apparently less than half an acre, the quite low value of the entire parcel, and the partial construction and non-habitability of the blue house at the time of the filing, it is quite unlikely any objection to the claim of exemption would have been successful. Thus, Creditor need not be concerned that the claim of exemption was a point in the proceedings where she could have altered the course of events.

[10] Even if exhibits 10 and 11 had been admitted to establish values, the valuation of $45,400 stated therein is remarkably close to the $40,000 total value asserted by Debtor in his schedules.

The problem with admitting into evidence the county documents to establish value is that doing so would not permit the parties or the Court to examine whoever it was that inserted the values into the documents.  That is, admitting the documents for the truth of their contents would leave the parties and the Court completely unable to ask the person or persons how those numbers were arrived at.  Did the numbers come from a county employee, or someone else?  Did that person actually inspect the property and then assemble and analyze a list of comparable properties, or did the person simply run a program that generated a number based on historic or perhaps unreliable data?  Did the $60,000 figure in exhibit 77 come from a contractor who did not know or care about what the property was actually worth?

The "information" in these sorts of documents is termed "hearsay" precisely because neither the parties nor the Court would be able to hear directly from and question the author(s) of the numbers to determine what the basis was for the values stated in the documents.  Further, the documents are lacking in other indicia of reliability, and so are not admissible. The essence of the trial process is to examine the factual predicates for and the reasoning that leads to the conclusions about value; admitting those documents to prove value would be completely contrary to the fact-sifting process that is supposed to characterize trials.  The rules of evidence that govern court

proceedings are not arbitrary; they are intended to permit the Court to arrive at a decision which is as correct as possible given the available <u>reliable</u> information.

Similar reasoning applies to the mortgage documents and the letters of Ms. Nichols. To begin with, taking a mortgage on a piece of property to secure repayment of a debt does not say anything about the value of the property. As the varying amounts of the mortgage debts make clear, ranging from $17,026.80 (exhibit 59) down to $1,241.04 (exhibit 63), regardless of how much Debtor was borrowing Coronado, Coronado obtained a mortgage. Thus, the mortgages were irrelevant on the issue of value. And Ms. Nichols, although acting in complete good faith to assist her daughter and to help the trustee do his job, did not provide an independent basis for valuing the property. She has no expertise as such in valuing real estate, and certainly not any that would qualify her to testify as a real estate expert pursuant to F.R.E. 702 (the federal rule of evidence that addresses expert witnesses).

Creditor also sought to introduce a considerable amount of information about the value of the Hoover Street property (also located in Salem) and of the mobile home. The specific issue being tried, however, was whether the transcript of judgment should be voided as to Debtor's homestead. Therefore the value of other property was irrelevant.

Similarly, evidence that harked back to Debtor not being denied his discharge (see Nichols-Shaw et al. v. Alanis, Adversary Proceeding No. 03-1378, in which this Court entered a judgment denying the complaint to deny Debtor his discharge) is also not relevant. Nor can the Court, in the name of equity or for any other reason, ignore the specific provisions of the Bankruptcy Code to impose additional requirements on Debtor to claim his exemptions, or to otherwise punish Debtor. Thus the Court has no authority to require Debtor to subdivide the Hayes Street property (which, as Creditor makes clear, seems eminently doable) and sell off half of it in order to partially satisfy the transcript of judgment. And Debtor, having obtained his discharge[11] and thereby his "fresh start", was entitled to purchase new vehicles and otherwise get on with his life.

Creditor also vigorously pursued information about any insurance policy that may have been in effect in 2003 against which Creditor could have claimed. Why Creditor was never able to obtain that information (despite having counsel for the civil tort action against Antonio Alanis and Debtor) is not at all

---

[11] Creditor also asserted non-dischargeability claims in the adversary proceeding she filed against Debtor. It is difficult to see how she would have been able to establish a §523(a)(6) claim when the language of the statute, "willful and malicious injury", in effect requires that she prove that it was Mr. Alanis (not his son) who <u>intended</u> to injure <u>her</u>. Thus, her decision not to use her limited resources to pursue that claim was very reasonable.

Page 14 of 16

Case 03-16513-s7    Doc 78    Filed 11/10/11    Entered 11/10/11 14:09:01 Page 14 of 16

clear to the Court, nor is it clear that there would be any basis whatever for making a claim against any such policy now. But more to the point, that entire issue is beside the point of whether the transcript of judgment impairs Debtor's exemption.

**Conclusion**

There is no question that Creditor has been terribly injured, physically and emotionally. She has explained on several occasions not only what the continuing disabilities are, which have required numerous surgeries and will require even more, but also how severely her injuries have impacted her ability to support and care for members of her family. The difficulty of her situation is apparent to the Court, and indeed has never been contested by Debtor. And now it is also apparent to Creditor that despite her years of effort, the state criminal and civil courts and the federal bankruptcy court cannot provide any significant help to her. This case illustrates the unfortunate reality that sometimes the legal system simply cannot provide resources where there are none, or which are not allowed by the law. The Court has no authority to act outside the bounds of the law even in terrible circumstances such as these.[12]

---

[12] Adam Liptak, the legal affairs writer for The New York Times, recently wrote about this issue.
> In a 1958 lecture, Judge Learned Hand, a towering presence on the federal appeals court in New York, recalled saying goodbye to Justice Oliver Wendell Holmes Jr. as the justice left for the Supreme Court.
> "I wanted to provoke a response," Judge Hand said,

Page 15 of 16

Case 03-16513-s7   Doc 78   Filed 11/10/11   Entered 11/10/11 14:09:01 Page 15 of 16

For the foregoing reasons, the Court will grant Debtor's motion to avoid the judicial lien created by the transcript of judgment with respect to Debtor's interest in the real property.[13]

*[signature]*

James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  November 10, 2011

COPY TO:

R Trey Arvizu, III
PO Box 1479
Las Cruces, NM 88004-1479

Shelly Nichols-Shaw
1004 Kimberly Cove
Round Rock, TX 78665

---

> "so as he walked off, I said to him: 'Well, sir, goodbye.  Do justice!'"
>     Justice Holmes gave a sharp retort: "That is not my job.  My job is to play the game according to the rules."

Adam Liptak, When Fairness and the Law Collide, One Jurist is Troubled, N.Y. Times, October 18, 2011, at A16.

[13] The Court of course is not making any ruling on whatever criminal restitution obligations any member of the Alanis family may still owe to Debtor.  Nor is the Court making any ruling on the effect of the transcript of judgment on any interest that Lorensa Alanis, Debtor's spouse, may retain in the property. Compare, for example, In re Page, 171 B.R. at 352 (Bankr. W.D.Wis. 1994) ("The debtor, therefore, was able to exempt her one half interest in the check but no more. It is irrelevant that because there were no objections, the entire check was deemed exempt.") with In re Schmiedel, 236 B.R. 393, 400 (Bankr. E.D.Wis. 1999) ("Similarly, upon the bankruptcy of a spouse, both spouses' interests in community property are protected, and this includes avoidance of a judicial lien.").